Next case is number 07-1211, DDB Technologies v. MLB ADV Media LP. Mr. Gannon, when you are ready. Good afternoon. May it please the Court. The brief raises many issues in this case as to why the District Court erred. I'm going to focus today on two issues that are related. One issue is whether or not Schlumberger and his successor, Major League Baseball, are stopped from arguing that the DDB patents fall within the scope of Dr. Barstow's employment agreement. The second issue, the related issue, is whether the DDB patents do in fact fall within the scope of the employment agreement. The second issue involves, quite frankly, a lot of issues. I heard Judge Dyke say today on another issue, how are we supposed to figure that out? I'm going to address that question, whether the patents relate to Schlumberger's business and whether the patents relate to Dr. Barstow's work. I'm going to address that secondly, but I want to talk about estoppel because that cuts through and disposes of the issue. Before you start there, help me on this discovery point. You asked for documents that related to Schlumberger's knowledge of these patents. You got a record in which the Schlumberger representatives say that there was no question that the invention that was described, that they knew about, was one that they were happy to have Dr. Barstow keep. The key question is, what did Schlumberger know about Dr. Barstow's work? You asked for documents pertaining to that, and the motion to compel is on 886, right? Correct. What has the record show happened about the negotiations with respect to this document request? Did your adversaries agree that you should get these documents, and then the district court denied them, or were you in the process of agreeing about that, or what happened? I'm glad you asked that. We asked for that discovery. Major League Baseball somewhat agreed to some of that discovery. The district court judge said, I'm not giving you any of it. Do we know from the record what they agreed to? No. No. We didn't get that far. Judge Yackel said, no discovery. Did he say why no discovery? No reason at all. He made that decision six days after the email came from Mr. Hal Sanders to Mr. Ross Jarson. Correct. We had a teleconference with the court, and the court unexplicably, in my view, denied the discovery. So unfortunately, we don't know the communications between MLB and Schlumberger. We don't know what Schlumberger thought, whether they thought they owned it. We don't know whether there's any records at Schlumberger that would establish, back in the day, what Schlumberger was thinking about whether the DDB patents related to Schlumberger's business. We didn't get any of that discovery. Does it matter that paragraph three of the employment agreement required your client to clearly bring to the attention of Schlumberger the patents? Sure, it matters. Then there's a finding on the estoppel issue by the district court that your client didn't do that. Well, there is a requirement that Dr. Barstow disclose a complete record of his invention. Not a written record, just a complete record, and that's one of the points where we believe the district court judge erred, because Dr. Barstow did, in fact, disclose a complete record of his invention. He told the in-house patent attorney about his invention. He told his boss, Reed Smith, about the invention, and he told him about the complete scope of that invention. Where is the testimony that reflects the disclosure of the complete scope? I'm aware of some of the testimony, but I didn't know about the complete scope. Let me direct you to A152. A152. This is the actual hearing in which the court allowed us five minutes or so of testimony of Mr. Houston. Mr. Houston, this is what he said, and I quote, What I recall at the time I discussed it, that's Dr. Barstow's project, with Dr. Smith, that's Dr. Barstow's boss, is that it had to do something to do with someone local in a sporting event capturing play-by-play data, and then that information being dispersed widely, that's another way of saying broadcasted, to users who could then see a simulation of the play, and I recall baseball specifically, and that applied to sports in general. That is the invention. That's it. Right, but it doesn't disclose how he used computers to do it, what the circuitry was, and whether or not that kind of circuitry might have had some application or use to Schlumberger, not in the baseball field, of course, but in the oil field or some other field. Well, that gets to the issue of what's Dr. Barstow's invention, because after all the employment agreement says, any invention that relates to Schlumberger's business is a sign. Not, for example, if Dr. Barstow had an invention that had a component, for example, a computer, under Major League Baseball's view, that would make it related to Schlumberger, because Schlumberger uses computers, and the DVD tax— Right, but didn't the obligation under Paragraph 3 go to disclosing the patents, if you had a patent? It absolutely did not. It did not. What's Paragraph 3 say? Paragraph 3 says that Dr. Barstow's required to disclose a complete record of the invention, I believe. I may be paraphrasing that. Well, does it really matter what he disclosed? You call this a stop or you call it a waiver, which it seems to me is the wrong designation for this issue. What we're really talking about is a question of contract interpretation, and should the conduct of the parties during the performance of the contract and thereafter veer on the question of contract interpretation, that sort of black-letter contract law. It's not really accurately characterized as a waiver or a stopple question. It's really a question of did the parties during performance interpret the contract. The problem is we don't know whether Schlumberger was saying to your client, you can keep this invention as referring to the inventions reflected in these patents, because we don't really know very clearly what Schlumberger knew other than this one statement that you read on 152. For example, the 630 patent issued during the period of Dr. Barstow's employment, right? Correct. It would be interesting to know whether there was a copy of the 630 patent in the Schlumberger files. We don't know that, right? And we don't know either because we were denied discovery. Your Honor, there was more than just this one quote from Mr. Houston about what they understood the invention to be. Yeah, but it strikes me that the record is not very clear about the detailed knowledge of Schlumberger. It's very vague. Now, maybe the documents, if you've gotten them, would have been helpful in that respect, but right now the record is not that clear. Well, Your Honor, I just want to point out that Mr. Houston testified that everyone at the lab, everyone at the lab that Dr. Barstow worked in, knew of the project. And they knew of the concept of— No, what's the project is the problem. The project is, quite simply, Your Honor, an observer at an event, like a sporting event, capturing what's happening at the event using a computer, entering symbols, that information going to a database computer, that being broadcast out to end users who are watching a simulation of the event. The email that was— But the parties that are in the lab that know all this are not parties to the employment agreement. It's the corporate entity. Chad Houston was the IP attorney, the in-house IP attorney at Schlumberger, whose job it was to oversee the IP and make these types of decisions. And let me just get this out because I think this is critical. Another thing that Mr. Houston testified to, he said at the hearing that Dr. Barstow's project, at least what he knew of it, which I believe was the whole invention, he said that that project did not relate to Schlumberger's business. Here's what he said, and I'm quoting on page 154, and this is a quote. Quote, what was considered was Dave, that's Dr. Barstow, came to Reed, that's Reed Smith, Dr. Barstow's boss. What was considered was Dave came to Reed and myself and said, this is what I'm doing. If there's any problem with this, let me know. And Reed and I discussed it, and we don't see how it applies to Schlumberger's business. Next question was, and did you tell Dr. Barstow that at the time? Answer, yes, we did. And what happened after that? There was a 14-year period where Dr. Barstow went out and spent millions building up DDB, a company. He has a licensee. He formed this company. He built the company. And the point is, what Major League Baseball and Schlumberger are doing now is saying, we want you to decide today whether the patents fall within the scope. When Schlumberger, back in the day, already made that determination. Did you ask to take Houston's deposition? Yes, we did. What happened about that? The court said, forget about it. Where? He said it in his denial of our motion for discovery. In fact, that was one of the items that we had asked for. We had asked for documents from Schlumberger, and we asked to take the deposition of Mr. Houston and Dr. Smith, Dr. Barstow's boss. And we were denied that discovery entirely. And what we were given at the hearing on the motion to dismiss was literally about five or so minutes each of testimony. Did he limit the amount of time for testimony? He did. He limited the entire hearing to an hour total. So we didn't have much time, unfortunately, to develop the record. How much time did you have for each witness? Actually, with Mr. Houston, it was probably 10 minutes or so, because we were working in a half an hour time frame. When we got to Dr. Smith, we said to the judge, we don't even have time to put him on the stand. And the judge said, well, I'll give you a minute or so, which is all we got. And let me point something else out real quick, and that is what was the invention, the scope of the invention? This testimony on A153 and A154 is Houston or Smith? A152 is Houston. A152 is Houston. Right, and also A160, where he talks about the technology related to sports in general. But if there had been a problem with this, let me know. Reid and I discussed it, and we didn't see who's that. That's A154. Yeah, and that's Houston? That's Houston. The Smith testimony doesn't start until A163. Actually, correct, A163. And starting on page 165 is where Dr. Smith also basically parodied what Mr. Houston said about his understanding of the invention. Hey, it's an observer at an event capturing data. Right, but I mean when Houston was testifying, you didn't get cut off, right? Well, we were to the extent that we only had a half an hour to complete our entire argument and have the witnesses testify. Well, right, but it doesn't show any questions you're asking where you got cut off. I understand that, but we were working within a certain time frame. You pretty much got all you needed right there on page 154, isn't it? Well, we were able to get that testimony. We were able to get what we got. What else would you have asked him if you'd had time? Well, I would have liked to have gotten discovery from Schlumberger and others there who were negotiating with Major League Baseball to see what they said about the— Right, but you didn't need any more from Houston. All we had was his recollection. That's correct. I see that I'm at a minute 37. Yes, you're into your rebuttal time. We'll save your rebuttal time. Let's hear from the other side. Okay. Thank you. Ms. Barnard. Thank you. This is a situation in which— I've got a—as you might have gathered from my questions, I have a concern here about the process that the district court followed in resolving this issue. He denied documentary discovery, which your client had apparently agreed to, at least agreed to some of it. He denied depositions of the key witnesses, and he limited the length of the trial. Now this, you know, isn't that error to do that? No, Your Honor. First of all, he denied additional discovery. Discovery had been going on in this case for over a year and a half, so there had been substantial discovery in this case. There had been substantial production of documents, tens of thousands of documents. How far into the discovery did you discover the employment agreement? We did not discover the comparison of the employment agreement with the activities of Barstow until his deposition was taken, which was the day before discovery cut off. Okay, so that means that all the previous discovery you were talking about is irrelevant. No, Your Honor. All the previous discovery asks for every document that was related to these issues, and every document was apparently... These issues didn't include the employment agreement until somebody discovered the employment agreement. Absolutely, Your Honor. You were living in the dark until you found the diamond in the rough. The document request that we submitted to DDB was very broad, and it included a request for all documentation in relationship to his employment with Schlumberger. That is how we obtained the employment agreement between him and Schlumberger, because it was a very broad document request asking for it. Would that document request have covered, for example, a copy of the 630 patent, which is in Schlumberger's files? Absolutely, Your Honor. At the hearing... Why would it have covered that? At the hearing... Why would the document request have covered that? Because we asked for everything that he had in relationship to his employment, and that issue, that patent issue, before he left Schlumberger. The question is not what you asked for. The question is what they asked for. Did they get... What makes it clear that if there had been a copy of the 630 patent in the Schlumberger files, that they would have gotten that in response to the earlier discovery? Well, Your Honor, I'm not following your question.  If the question is whether there was a request for documents from the Schlumberger file, we asked Mr. Barstow to produce all documents he had at the time he was at Schlumberger. We're not talking about what he had. What we want to know is, from the initial discovery request that your adversary propounded, if that discovery request had been fully complied with, would the patents in suit, if they had been in Schlumberger's file, been turned over? When they propounded a discovery to MLB, the answer to that is no. However, at the time we discovered this, we did ask, and Mr. Gaudier testified at the hearing, that he searched for all documents relating to the Schlumberger and Barstow patents. He testified to that at the hearing. Who's that? Mr. Gaudier was the chief IP counsel, and he had been at Schlumberger for 26 years, including the entire time that Barstow had been employed by Schlumberger. Where's that testimony? That testimony, Your Honor, is at A137. So at what stage in this discovery proceeding was the contract with Schlumberger, the transfer of Schlumberger's rights, made known to Barstow? Barstow produced that document, Your Honor. So when you say at what point was the document produced and made known to Barstow, I'm not understanding your question. He produced to us the Schlumberger-Barstow employment agreement. No, no. It's the arrangement between Schlumberger in transferring whatever rights it had under the agreement. When did we produce the document that Schlumberger had transferred its rights to MLB-AM? Yes. Yes, we produced that at the time that we filed the motion to dismiss. That document was irrelevant to the knowledge between the two. That was merely a cooperation document, which is clear that Barstow and DDB had a cooperation clause in their agreement. But why would it have been at issue until Schlumberger asserted, apparently, some ownership in this invention? Your Honor, this was an automatic right of assignment. Schlumberger always had a right in these agreements, pursuant to the clear law of Texas and this Court. So whether or not they came forward and asserted a right, this Court has already determined in Film Tech, Speedplay, and Israel Bioscience that there was no obligation for Schlumberger to come forward when it had an automatic assignment of patent rights in this instance. Well, I'm not sure that's true because there is this contract law that says that the party's contemporaneous conduct is very pertinent to asserting an agreement like this. If Schlumberger knew for 30 years what the patents were and made no assertion of rights under those patents, doesn't that strongly suggest that it believed that there had been no coverage of the agreement of those patents? Under the circumstances you set forth, I still think that the law says no under those circumstances. There is no right to an adverse possession of a patent. No, that's not the question. It's not adverse possession. It's a question of contract interpretation. There's a contract here. It has some terms which are on their face, not immediately clear. The question is how did the parties interpret those provisions for the 30 years that those contract provisions were enforced if, in fact, the record and the documents were to disclose that Schlumberger well knew about what Dr. Barstow's patents were, that indeed they had copies of the patents in the files, and that they had said under those circumstances that we have no claim to those patents, that would be very difficult for you, right? Well, Your Honor, under those facts and circumstances, again, they're not the facts and circumstances of the issue here. At this hearing, both Mr. Smith and Mr. Houston testified that what Barstow told them, they were clear, was that this was a baseball patent. Every claim in this patent, every specification aspect, is much more broader than baseball. Yeah, but maybe there are documents in the record which show that they actually had the patent, that they knew what the scope of the patent was. So isn't the plaintiff here entitled to discovery from the files to see those documents, to see whether, in fact, Schlumberger was sitting on the patents and knew exactly what they were? First of all, Your Honor, no, that is not. The record is not unclear on this issue. Every witness testified from Schlumberger, even the witnesses that Dr. Barstow called, that he had told them repeatedly what this was about. They also testified there were no additional documents that were produced to them during the course of his employment. The testimony about no additional documents, that's Mr. Gaudier. Mr. Gaudier testified to that, as well as Mr. Shugart and Mr. Huston. Mr. Gaudier said, as a matter of courtesy to the court, I made a voluntary search. That was not a search under compulsion. He testified under oath, Your Honor. I understand he testified under oath, but I'm just saying, somebody who goes through their files and makes a good faith attempt to see what's in the files and then testifies, I look in the files, truthfully, that's one thing. But if I give you a subpoena, Dukas-Eckham, under the authority of a court, you typically hire a lawyer who goes through your files to find out what's there. Well, first of all, Your Honor, these people were lawyers, and they testified under oath that they had looked for documents and didn't find any. Mr. Smith testified that there were no documents produced. Let me ask you the question this way. Let me put the question to you this way. Let's just assume we had an entirely different case here. Let's assume we had a case here where the trial judge had allowed the discovery that the plaintiff would like to have had. And let's assume that discovery found in Schlumberger's records copies of the patents in suit contemporaneous with the time they were filed. Let's assume that the record also showed that noted on those patents was a signature by someone in a position of authority at Schlumberger saying these patents do not relate to our business and we have no interest in them. Let's assume that was in the record. And let's assume that the trial judge then had construed the circumstances and said, well, that evidence says to me that the contemporaneous evidence of the parties as they construed this agreement, these patents fell, this invention fell outside the agreement. And the trial judge so ruled. Would you have appealed that ruling as incorrect? Yes, Your Honor.  Because the automatic assignment of the patent that occurred here as an operation of law as an operation of law means that the patent rights were vested in Schlumberger invention rights the moment they came into being. So if a trial judge ruled that despite the automatic assignment language, which it is clear that this was an automatic assignment, there was no dispute between the plaintiff and the defendant about that, that if there was an automatic assignment... Let me just stop you for a second. Notwithstanding that law, the law allows Schlumberger, the automatic owner of the patent, to sell it or to devolve it to somebody else, right? Yes, Your Honor. How about if they devolve it right back to the inventor on the grounds that they are not going to assert title to it even though it is theirs under the contract? Under the law of the patent statute under section 261, if they were the owner of the patent and under an automatic assignment clause they would be, section 261 requires the transfer back to Barstow to be in writing. There was no writing here. Everybody testified that every document that was relevant here was produced. There were no more documents. It's mere speculation. And we have case law to show that the mere speculation that a document might exist is not abusive discretion here where the judge has broad discretion on discovery. You know, Ms. Bonner, even on your theory of an automatic assignment, it's not every idea that every employee has. It still has to meet the requirements. Absolutely. In the contract of relating to the business. Absolutely, Your Honor. And so it's not an automatic assignment unless that is established as being the situation. It's an automatic... There are two separate clauses here. It is an automatic assignment of every invention. And then that invention must fall within the context of the employment agreement as one of the business activities... That's how you read that agreement. It doesn't say that. Have you got the agreement? I've got the agreement right here. What page? It's on page 8 of the brief, of MLB's brief. Page 8? Yes, page 8. It says, employee agrees to and does hereby grant and assign to company. It's the first thing. So he already agrees and hereby assigns his entire right, title, and interest in and ideas to inventions and improvements coming within the scope of paragraph 3. So you've got to look at paragraph 3. No, you didn't finish the sentence. He's got a colon with an ABC, which qualifies that sentence. Absolutely, Your Honor. And in this situation... You skipped that. Yes. I was going to go back to paragraph 3 as Judge Clevenger had indicated, but when reading that A, B, and C, that's absolutely true. What happened here was the judge did not need to rely on any of the testimony. He made this determination based on the documentary evidence of what the patent claims are, what's in the specification, what the documents show, that Schlumberger's business is. But the problem is he didn't have all the documents. Suppose, as Judge Clevenger is, suppose the document that's in there, they have a copy of the patent during the time of Dr. Barstow's employment and somebody has noted on it, the general counsel has noted on it. I've looked at this. It's not within the agreement. It doesn't relate to our business and we have no problem with Dr. Barstow keeping this. You'd lose, right? I just disagree with you, Your Honor, on this issue. How could you possibly win? Because the clear indication here, they could have reassigned it back to Barstow, but the language is clear here. Wait, wait, wait. You had earlier argued that the minute of the conception of the invention there was this, the ownership just flew over and... Automatic by operation of law, Your Honor. Yeah, but only ones that that happened to are the inventions that relate to the business activity. And the judge was entitled to make that finding based on the documents before him. You're getting ahead of yourself. So if indeed the decision had been made by Schlumberger when they were aware of the invention and they had said, we don't want it, it doesn't belong to us, it's not in the scope of the agreement, then you would agree, would you not, that that would be so and Schlumberger would not have owned the patent. No, Your Honor, I would not agree. They would have decided it's not within the scope of the agreement. No, Your Honor, I would not agree. I would say to you that if the business of Schlumberger falls within the contours of this agreement, whether individuals said it or not, if I looked at the business documentation of what Schlumberger was doing and the oil well drilling, software, real-time data transmission, and it fell within the scope of this agreement, the business activities, that this agreement covers that and that the only thing that could then happen because of the automatic assignment of the patent to Schlumberger is that Schlumberger could transfer that information back to Barstow and there was a procedure for doing that. Let me ask another question. The witnesses testified at the hearing that there was a procedure if an employee wanted an invention that they could petition Schlumberger to have that invention back. Did Schlumberger ask Dr. Barstow, looking at the contract, to execute an assignment? No need to, Your Honor. It was automatic. He didn't need to ask for that. If you take it and say that he... If said employee agrees to execute specific assignments, if Schlumberger is now going to transfer the patent that they say is assigned to them, my question is, did they ask Dr. Barstow to execute an assignment which they would then transfer to the defendant? He didn't need to execute an assignment that they could transfer back. I didn't ask if they needed to. I asked if they asked for it. The answer is no, Your Honor, because they didn't need to. What they would have needed to do was for him to ask them to transfer the assignment to him because they own the patent already. Okay. Thank you, Ms. Varner. Just real quick, Your Honor. On page A471, that's the employment agreement. Paragraph 4 at the bottom says employee agrees to execute specific assignments. That's right in the agreement.   I'm just going to say that Oh, and by the way, Mr. Houston never asked, or anybody at Schlumberger ever asked Dr. Barstow to execute specific assignments with respect to the DDD patents in suit. With respect to the discovery issue, Mr. Gardier, he was at the hearing on the motion to dismiss. We put the subpoena in front of him on the discovery we requested. We showed him Schedule B, which lists all the documents and information we were requesting. And he testified on page A143. He was asked, In an effort to prepare for the testimony you gave Ms. Varner today, did you go through and try to find all the documents that are described here in this schedule of documents? Answer, no, I did not. Didn't even bother to check for those documents. One other point I want to make, Your Honor. Judge Newman, you asked whether or when the employment agreement was produced. It was one of the first documents produced in the case. No, I asked when the agreement between Schlumberger and the defendant was produced. Okay, the actual employment agreement was produced in the spring. They had it. Mr. Gardier testified that he was in negotiations with Major League Baseball for seven months. The agreement was actually signed, I believe, in April or early May. And it was not even produced to us until they dropped the motion to dismiss Ahns, which was on the eve of trial. Okay, any questions? Thank you, Mr. Gardier and Ms. Varner. The case is taken under submission. All rise. The Honorable Court is adjourned for the day today. Thank you, Your Honor.